JEFFERSON McDANIEL, Appellant, v. BANKERS LIFE COMPANY et al., Appellees.

No. 40152.

OCTOBER 21, 1930.

*Moore & Moore* and *Guy A. Miller*, for appellant.

*Alberson & Nourse* and *W. D. Milligan*, for Bankers Life Company, appellee.

*Batschelet & Vincent, R. G. Howard* and *S. J. Sayers*, for Farmers State Bank of Yale, appellee.

EVANS, J.—I. The plaintiff formerly lived on a farm in Guthrie County. While he lived there, he transacted more or less business with the Farmers State Bank of Yale, and continued to transact more or less business therewith up to the time of the beginning of this suit. On or about the year 1920, or prior thereto, he moved from the farm to the city of Des Moines, where he has lived ever since. In Des Moines he purchased a homestead, which he has occupied ever since. His family consisted originally of himself and wife and five children. These latter are all now full grown, the youngest being 25 years of age; so that, in these later years, his family has consisted of himself and wife only. Since coming to Des Moines, the plaintiff has obtained employment "off and on" from two employers, his labor consisting, in the one case, of firing a boiler, and in the other, of janitor work. Such work has imposed upon him long hours, and has rendered him ordinarily inaccessible in the daytime; and the current business of the household in the matter of incurring and paying the household bills has rested largely upon the wife. All the household checks which appear in evidence purport to have been drawn by the wife. The intimations of the plaintiff, as a witness, are that the alleged forgery was perpetrated by his wife, who died in January, 1928. The plaintiff testified, on cross-examination, as follows:

"She was a good woman, and I can't think she was dishonest. I kind of suspicioned there was something wrong, that is all. I didn't know that she was dishonest, but I was thinking

there was something wrong: that is, I suspicioned it in my own mind. That was a couple of months ago; and then I would think I must be mistaken, and said nothing. I commenced to think it in December, when I was notified of the fact that there was something wrong. I suspicioned it slightly before that. I thought the money was going a little too fast, for some cause or other, and I could not comprehend the idea. I had a little experience with the money question. She would say: 'Jeff, your check will be due again pretty soon, and I am getting a little scarce of money.' I thought she had enough money, from what my boy and I earned here, together with the proceeds of the place. I thought she had enough money to carry it along, without wanting any more. She had no other independent means. She never asked for money before. We owned the homestead in Des Moines in common. I aimed to equalize with her. I did not get very much education, and had to work when I was a kid. * * * If I had to write, she would get angry if I got it wrong, and that is the reason I told her to do the writing. She was a better speller than I was, and had gone to school longer. The $7,000 mortgage to the Prudential Insurance Company was a valid mortgage. I think it drew 6 per cent.''

At the trial, the plaintiff rested his case upon his own testimony, wherein he asserted that his purported signatures to the note and mortgage and interest coupons on the $12,000 loan were all forgeries, and were neither authorized by him nor known to him. He testified that, until December, 1927, he did not know that a $12,000 mortgage purported to be extant against him.

Disregarding, for the moment, the question of the actual genuineness of plaintiff's purported signature as such, the pivotal question which puts plaintiff's evidence to the test is whether he knew of the execution and the existence of the $12,000 mortgage upon his farm; and to this question we give our first attention.

One anchorage in the case is a $7,000 mortgage made to the Prudential Life Insurance Company in 1921. The plaintiff concedes that this mortgage was valid, and that he knew that it had fallen due, and that arrangements had been made to meet the same by the execution of a new mortgage. He contends, however, that such new mortgage was for $7,000, and no more.

The old mortgage drew 6 per cent interest, and the full amount of principal and interest at the time of maturity was $7,420. Plaintiff testified that he knew of no provision made for paying the $420 interest. As against this, it appears from the testimony for the defense that the plaintiff was, at the time of the maturity of this mortgage, indebted to the Farmers State Bank of Yale for more than $5,000. The bank officials proposed to both Mr. and Mrs. McDaniel to negotiate for them a first mortgage loan of $12,000, and apply the proceeds of the same to the discharge of the $7,000 mortgage, the balance to be applied upon the indebtedness due the Farmers State Bank. This proposal was accepted by the husband and wife, and a $12,000 mortgage on the farm was made, in January, 1926, to the Farmers State Bank. This plan contemplated the sale of the $12,000 mortgage by the Farmers State Bank to some loaning company. Pursuant to this plan, the bank solicited the Bankers Life Company to purchase the mortgage. The Bankers Life Company official expressed himself as unwilling to purchase, but as willing to *make* the loan and to take a mortgage upon its own blank forms. Thereupon, a new set of papers was executed, wherein the Bankers Life Company became the payee. Upon the execution of this mortgage to the Bankers Life Company, on March 9, 1926, the mortgage for the same amount, made in January, 1926, to the Farmers State Bank, was canceled. Thereupon, both plaintiff and his wife signed an order addressed to the Bankers, Life Company, directing it to pay the proceeds of the loan to the Farmers State Bank. The Bankers Life Company produced this order at the trial, and introduced it in evidence. It reads as follows:

"Bankers Life Company,
"Des Moines, Iowa.
"Please pay the proceeds of my loan for $12,000.00 secured by note and mortgage dated March 9, 1926, to Farmers State Bank, Yale, Iowa.

"Jefferson McDaniel
"Mary A. McDaniel"

The plaintiff does not deny his purported signature upon this order, nor has he offered any explanation to avoid the effect of such order as evidence. With the proceeds of the loan thus

put into the hands of the Farmers State Bank, it paid off the $7,000 mortgage, and applied the balance upon its own indebtedness. Such application left a balance due Farmers State Bank of $1,750, for which amount the plaintiff and his wife gave a second mortgage upon the same farm. This second mortgage is the subject of the companion suit already referred to, wherein the plaintiff claims such second mortgage to be also a forged instrument. That the plaintiff was indebted to the Farmers State Bank for the amount claimed, is proved without dispute in the evidence. The plaintiff admits negotiations with Heater, the cashier of the Farmers State Bank, for a new loan. His denial goes only to the amount of it, and to the genuineness of his signature to the $12,000 mortgage. As bearing upon that feature of the dispute, significant circumstances appear. The plaintiff admitted that he had agreed to pay Heater a 1 per cent commission to obtain the loan. He also testified that the commission was to be $120. That he had a good mathematical conception of percentage was indicated in his cross-examination. He testified readily that 6 per cent of $7,000 was $420, and that 5 per cent on $12,000 was $600. The mortgage in suit drew 5 per cent interest, payable semiannually on February 1st and August 1st of each year. Several of the semiannual installments had become due and delinquent before plaintiff's discovery of the alleged forgery. This delinquency became the occasion for letters from the Bankers Life Company. These letters were all duly addressed to the plaintiff's address in the city of Des Moines. These were letters advising plaintiff in each case of the amount of his delinquency. The first installment of interest became due August 1, 1926. Partial payments had been made thereon prior to October 25th, on which date a letter was written and mailed to the plaintiff by the Bankers Life Company, advising the plaintiff that the amount of $131.67 was still unpaid upon such installment. Similar letters relating to subsequent successive installments were written on April 28, 1927, May 24, 1927, August 16, 1927, August 20, 1927, October 4, 1927, and October 27, 1927. The following is a copy of the last-named letter, which is sufficiently illustrative of all:

1284

"October 27, 1927

"Mr. Jefferson McDaniel
"1241- 30th Street
"Des Moines, Iowa.
"Dear Sir:

"Our records show that there is still a balance of $202.00 unpaid on the August 1927 coupon on your loan of $12,000 with this Company.

"We are now preparing our Annual Financial Statement, and request that you make arrangements to take care of this balance without further delay, as we do not wish this delinquency to appear on our statement.

"Yours respectfully,
"Bankers Life Company
"By                    "

"WEB :AW

The plaintiff denied that he had ever received any of such letters. It is shown that they were properly addressed to his residence, and that the envelopes bore the return card of the Bankers Life Company, and that the required postage was paid thereon. Remittances were made, from time to time, in accord with the demands contained in the letters.

It further appears that the plaintiff was personally called to the phone at successive times by employees of the Bankers Life Company, whose duties required them to make the collection. Barnes conversed with him over the phone on the subject, and advised him of the amount of his delinquency. He made no denial of Barnes's testimony. Lockwood conversed with him on the same subject. He admitted his conversation with Lockwood, though he denied the use of certain language attributed to himself by Lockwood. He did not deny that the subject-matter of the conversation related to the delinquent interest. The fact that remittances were ultimately made, from time to time, in full payment of the delinquent installments, and in accord with the demands of the correspondence, is itself a circumstance tending to show either that the plaintiff did receive the letters, or else that he knew, independently of the letters, just what his delinquencies were. It would be difficult, upon the record before us, to entertain any doubt that the letters addressed to the

plaintiff reached their proper destination. Without pursuing further details along this line, we see no room to doubt that the plaintiff knew that he had a $12,000 mortgage on his farm, and that he paid, or directed to be paid, the successive installments of interest thereon, regularly, though tardily. The weight of the evidence to that effect is quite overwhelming.

If it were true, therefore, as he intimates, that his wife, rather than himself, signed his name to the note and mortgage, it is not incredible that she was authorized to do it. In any event, his conduct with knowledge of the mortgage was a complete ratification thereof. The plaintiff admits he had no domestic trouble. The wife was frugal, industrious, and competent. The wife had no motive to wrong her husband. If this mortgage was procured by the Farmers State Bank as a method of defrauding the husband, it would operate precisely in the same way upon the wife. The charge of forgery was withheld by the plaintiff until after the death of his wife. True, he contends that he did not learn of it until about a month prior to her death. But the weight of the evidence is against him on that contention. In the absence of any motive on the part of the wife to commit the forgery, or of any advantage to be gained by her, we should be as reluctant as the plaintiff himself professed to be, to believe that the dead wife had been guilty of a crime with which no accuser charged her until her own lips were closed. And this would be so even though we believed, upon the record, that the name of her husband had been written by her. The plaintiff himself concedes that in times past she had signed for him, at his direction.

II. Is the purported signature under attack genuine? The plaintiff has rested this issue upon his own denial of such genuineness. He has not offered corroboration by any witness or by any circumstance. The district court found against him on that issue. The record presented here is of doubtful sufficiency to enable us to review such finding. More than one hundred exhibits were introduced in the district court, many of them consisting of instruments signed by the plaintiff. The appellant's abstract sets forth virtually none of them. The plaintiff put in evidence Exhibits C and D, to be used as a standard of comparison. These consist of the name of the plaintiff, written by himself, shortly before the trial, for the purpose of comparison.

These voluntary signatures were before the witnesses who testified on behalf of the defendant in support of the genuineness of the signature under attack. Since the trial, they have been lost, and are, therefore, not produced for our inspection. The testimony of the plaintiff himself abounds in self-contradiction. His attention was directed, as a witness, to many of his purported signatures. At one stage or the other of his evidence, he denied virtually all of them. Notwithstanding his denials, he also admitted many of them. In a given instance, we find it difficult to determine whether he finally intended his denial or his admission to stand. It appears that, in 1925, he had executed a mortgage for $3,000 upon his Des Moines property to the Security Loan Company, and likewise, he executed a mortgage for $650 to McCutchen-Standring. Our interpretation of the plaintiff's evidence is that he admits the genuineness of these mortgages and notes and of his signatures thereto. We have photostatic copies of them before us; likewise, a photostatic copy of the mortgage under attack. We find the likeness of the signatures to be apparent and persuasive. This likeness affords a strong support for the testimony of the several witnesses for the defendant, who testified to the genuineness of plaintiff's signature. Some of these witnesses were personally acquainted with the plaintiff's signature, and testified on that hypothesis. At this point also we think that the overwhelming weight of the testimony is against the plaintiff.

The decree of the district court is, accordingly,—*Affirmed.*

MORLING, C. J., and FAVILLE, KINDIG, and GRIMM, JJ., concur.